Filed 9/12/25  Kayar v. HJC Corporation CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| MELIH KAYAR,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>HJC CORPORATION,<br><br>    Defendant and Respondent. | G063848<br><br>(Super. Ct. No. 30-2021-01232062)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Erick L. Larsh, Judge. Reversed and remanded.

MLG, APLC, Attorneys at Law, Jonathan A. Michaels, Travis R. Eagan, and Allan D. Kellogg on behalf of Plaintiff and Appellant.

Littleton Park Joyce Ughetta & Kelly and Keith A. Sipprelle on behalf of specially appearing Defendant and Respondent.

HJC Corporation, a business in South Korea (HJC Korea), designs and manufactures motorcycle helmets. HJC America Inc. (HJC America), a wholly owned subsidiary of HJC Korea, performs marketing and other services in the United States for HJC Korea. After plaintiff Melih Kayar was injured wearing an HJC Korea helmet, he filed a products liability suit against multiple defendants, including HJC Korea, HJC America, and Michael Quach. Because HJC Korea does not have a designated representative to receive service of summons, Kayar delivered the documents to the president of HJC America as substitute service for HJC Korea. HJC Korea specially appeared and moved to quash service of summons based on defective service and lack of personal jurisdiction. The trial court granted the motion on both grounds. Kayar contends the court erred. We agree and reverse.

FACTUAL AND PROCEDURAL BACKGROUND

In 2019, Kayar rented a motorcycle, helmet, and jacket from defendant Quach using a peer-to-peer website. The helmet was a Department of Transportation (DOT) certified HJC helmet, model CS-10 Tatoo. On his ride to return the motorcycle and gear, Kayar had an accident, causing his head to strike a raised median and metal railing. The helmet cracked and the metal railing pierced Kayar's brain, resulting in a traumatic brain injury.

In November 2021, Kayar filed a complaint, and a year later, he filed a first amended complaint against HJC Korea, HJC America, and Quach. The first amended complaint contained four causes action. As to HJC Korea and HJC America, it alleged strict liability-manufacturing defect and strict liability-design defect. It alleged negligence against all three defendants. And it alleged negligence-failure to recall against HJC America. The operative complaint alleged "Kayar was severely injured because of the

2

reckless and negligent behavior of defendants in designing, manufacturing, and distributing the HJC CS-10 Tatoo helmet."

Kayar substituted service on HJC Korea by delivering the summons, first amended complaint, and other documents to George Hong, the sole officer, director, and president of HJC America, at the business office of HJC America. A follow-up mailing of the operative documents was made to the business address of HJC America.

HJC Korea specially appeared in the action and filed a motion to quash service of summons of the first amended complaint. HJC Korea argued service was defective because Kayar did not deliver the documents "to an officer, general manager, or agent authorized to accept service on behalf of HJC Korea, and the documents were not served on it in accordance with the requirements of the Hague Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ('the Hague Service Convention')." HJC Korea asserted Hong did not fall into any category of persons who may be served process on its behalf. In its motion, HJC Korea also argued the court lacked personal jurisdiction over it.

HJC Korea supported its motion with a declaration by Alex (Young Taek) Choi, the "Standards Team Director" for HJC Korea. Choi stated HJC Korea's principal place of business is in South Korea. It conducts no business in California and "is not qualified, licensed, registered or authorized to transact business in California." "HJC Korea designs motorcycle helmets, including the HJC CS-10 model motorcycle helmet that is alleged to be at issue in this case, in South Korea." All HJC designed motorcycle helmets are manufactured in either South Korea, Vietnam, or previously China. HJC Korea has never manufactured motorcycle helmets in the United States. Choi declared "HJC Korea sells its motorcycle helmets to

3

distributors throughout the world, including the United States" but does not sell any motorcycle helmets directly to consumers in the United States. "Distributors who purchase HJC Korea motorcycle helmets take title to the helmets in South Korea, and then import them into various countries, including the United States. Distributors then independently sell the helmets to retailers or consumers." Once HJC Korea sells a motorcycle helmet to a distributor, it plays no further role in the distribution of the helmet, including sale of the helmet to the "end user." Choi averred "HJC Korea does not directly advertise or market its products in California or to California residents." "HJC Korea does not sell its products directly to consumers located in California, nor is any of its marketing or advertising expressly targeted toward the residents of California." Choi also stated HJC Korea does not have any employees operating or residing in California, the corporation has never owned property in California, does not earn direct revenue from sales of products in California, and does not maintain an office in California.

In his declaration, Choi explained HJC America is a separate legal entity from HJC Korea and HJC America is a California corporation with a business address in California. HJC Korea does not have a registered agent for service of process in California and individuals affiliated with HJC America, including Hong, are not authorized to accept service of legal process on behalf of HJC Korea.

Kayar filed an opposition to HJC Korea's motion to quash services of summons. He argued his service of the summons and operative documents on Hong was effective because he was not required to serve HJC Korea through the Hague Service Convention. He contended service was effective under California law because "Hong qualifies as a 'general manager

4

in this state' for purposes of Corporations Code section 2110." Regarding HJC Korea's argument the court lacked personal jurisdiction, Kayar asserted HJC Korea's contacts with California are sufficiently pervasive to subject it to the court's general jurisdiction, and the court could reasonably exercise specific jurisdiction over HJC Korea because the company purposefully availed itself of the benefits of doing business in California and his claims relate to or arise out of HJC Korea's contacts with California.

Kayar presented evidence showing HJC America, which is incorporated in California, is a wholly owned subsidiary of HJC Korea. HJC America does not generate any sales or profits. Its funding (approximately $1.2 million to $2 million) is provided entirely by HJC Korea.

Hong is HJC America's president, sole director, and officer. In his deposition, Hong denied being a direct employee of HJC Korea, but he talks to them "all the time" about business issues. Describing the relationship between HJC Korea and HJC America, Hong stated: "HJC [Korea] is the company that designs and manufactures the products, and HJC America is an entity that markets the products." HJC America exclusively markets HJC Korea's products, and HJC America is the only company that performs marketing for HJC Korea's products in the United States. In addition to marketing, HJC America answers customer service calls in its California office. HJC America also acts as a liaison between HJC Korea and its two distributors in the United States. Additionally, HJC America provides some graphic design services to HJC Korea. Hong identifies what is "trendy" or "cool" in the North American market and relays that information to HJC Korea, which has ultimate development responsibility.

Hong also negotiates license agreements between HJC Korea and other companies including Red Bull, Marvel, DC Comics, Activision, Sega,

5

Universal, and Replica. HJC Korea helmets are shipped to testing laboratories in California and other states. Hong has gone to laboratories to see the testing of HJC Korea helmets as HJC America acts as a liaison between HJC Korea and the DOT.

HJC Korea creates manuals for its helmets. HJC America maintains a website that contains these manuals and other substantive information created by HJC Korea about its products, including the catalog of products, minimum advertised price policies, HJC Korea's usage and replacement guides, as well as helmet inspection, care, and disposal guides. HJC America also posts on its website scenes of riders in California. The information on the website is available to consumers in California, and the website's purpose is to generate sales in California and elsewhere.

In marketing and promoting HJC Korea's products, HJC America manages a racing program by finding top riders, sponsoring them, and providing them with HJC Korea helmets. The only role HJC Korea has in the United States racing program is manufacturing the helmets.

Asserting HJC Korea's contacts with California are sufficient to subject it to the state's jurisdiction, Kayar presented evidence the corporation uses two distributors for its helmets in North America, one of which, Helmet House, is headquartered in California. In 1986, HJC Korea executed a sales agreement with Helmet House, and the agreement has remained in effect since. The agreement states HJC Korea is in "the business of manufacturing motorcycle helmets and relative accessories for motorcyclist [*sic*] and is expanding sales into the State market." The agreement requires Helmet House to import at least $600,000 in HJC Korea brand products per year and guarantees HJC Korea $150,000 in purchases per quarter. The agreement

6

requires HJC Korea to purchase and maintain products liability insurance and include Helmet House as a co-insured under the policy.

To place an order, Helmet House emails HJC Korea. When the order is ready for shipping, HJC Korea invoices Helmet House, which wires payment from its bank in California to HJC Korea's bank in South Korea. HJC Korea's products are shipped to Helmet House via two ports, one of which is in California. Since 2013, HJC Korea has sold over 1,332,800 products to Helmet House. Of these, 286,867 were sold to Helmet House customers in California. HJC Korea's other North American distributor also distributes helmets into the California market.

Prior to the pandemic in 2020, HJC Korea would send, twice annually, multiple representatives to the United States to gauge the market and meet with representatives of their two North American distributors.

At the hearing on HJC Korea's motion to quash, the trial court indicated it was a close case. After taking the matter under submission, the court granted HJC Korea's motion to quash service of summons and first amended complaint. In a detailed written ruling, the court held Kayar failed to establish the substituted service on Hong or HJC America was effective as to HJC Korea. The court also concluded Kayar failed to make the requisite showing necessary to establish general jurisdiction or specific jurisdiction and ordered dismissal as to HJC Korea. Kayar timely appealed the court's order.

## DISCUSSION

### I.

### SERVICE ON HJC KOREA

"In the absence of a voluntary submission to the authority of the court, compliance with the statutes governing service of process is essential to establish that court's personal jurisdiction over a defendant." (*Dill v. Berquist Construction Co.* (1994) 24 Cal.App.4th 1426, 1439.) "When a defendant challenges that jurisdiction by bringing a motion to quash, the burden is on the plaintiff to prove the existence of jurisdiction by proving, inter alia, the facts requisite to an effective service." (*Id.* at pp. 1439–1440.)

Service on a foreign corporation outside the United States can be made through the Hague Service Convention if its country of incorporation has signed the treaty.[1] The Hague Service Convention applies to "'all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad.'" (*Volkswagenwerk Aktiengesellschaft v. Schlunk* (1988) 486 U.S. 694, 699.) But it is not implicated where service on the foreign corporation's domestic agent is valid under state law and the due process clause. (*Id.* at p. 707.) Thus, "an attempt to serve process on a foreign corporation by serving its domestic subsidiary which, under state law, is the foreign corporation's involuntary agent for service of process" (*id.* at p. 696) is valid service (*id.* at p. 707).

In California, "Code of Civil Procedure section 416.10 governs how to serve corporations." (*Yamaha Motor Co., Ltd. v. Superior Court* (2009) 174 Cal.App.4th 264, 271 (*Yamaha*).) It allows service of process on a foreign

---

[1] According to HJC Korea, South Korea signed the Hague Service Convention in 2000.

corporation using the procedures in Corporations Code section 2110. (Code Civ. Proc., § 416.10, subd. (d).) Corporations Code section 2110 provides that summons may be served on a foreign corporation by hand delivery "to any officer of the corporation or its general manager in [California,]" or to any person designated by the corporation as agent for service of process. (Accord, *Yamaha*, at p. 272.)

The issue here is whether HJC America or Hong qualifies as HJC Korea's "general manager" in California for service of process purposes under Corporations Code section 2110. Although general manager is not specifically defined in this context, case authority has provided guidance.

In *Yamaha*, a prior panel of this court considered the same basic issue before us—"whether a Japanese manufacturer can be served under California law simply by serving the Japanese manufacturer's American subsidiary" instead of following the Hague Service Convention's procedures. (*Yamaha, supra*, 174 Cal.App.4th at p. 267.) The panel in *Yamaha* concluded "yes, it really is that easy," after determining the California Supreme Court's decision in *Cosper v. Smith & Wesson Arms Co.* (1959) 53 Cal.2d 77 (*Cosper*) was controlling authority. (*Yamaha*, at p. 267.)

"In *Cosper* . . . , a police officer whose revolver exploded on him sued the Massachusetts corporation that manufactured the firearm. The Massachusetts corporation, however, had no agents, salesmen, or other employees in California. [Citation.] But it did have a contract with a California representative to promote, on a "'non-exclusive basis"' the sale of its products on the West Coast. Basically, he was a sporting goods salesman. [Citation.] The Supreme Court held that service on this representative *was* sufficient to serve the Massachusetts corporation because the representative was the "'general manager in this State."'" (*Yamaha, supra*, 174 Cal.App.4th

9

at p. 273.) The California Supreme Court held in *Cosper* "service on the sales representative was valid service on the corporation itself, reasoning that the representative had 'ample regular contact' so that it was "'reasonably certain'" that the representative would apprise the manufacturer of the service." (*Yamaha*, at p. 273, quoting *Cosper, supra*, 53 Cal.2d at p. 83.)

The *Yamaha* court concluded: "*Cosper* applies a fortiori to this case—that is, the relationship between the manufacturer's representative and the manufacturer in *Cosper* was far less intimate, far less connected, and far less interrelated than the relationship between Yamaha-America and Yamaha-Japan in the case before us. If, in *Cosper*, a sporting-goods-oriented nonexclusive purveyor of Smith & Wesson guns on the West Coast was a 'general manager in this State' under Corporations Code former section 6500, how much more so is Yamaha-America the 'general manager in this State' here, where (unlike *Cosper*), Yamaha-America is the American face of the Japanese company: Here, Yamaha-America *does* have an exclusive arrangement to sell the manufacturer's products, provides warranty service, English owner manuals, does testing, marketing, and *receives complaints* about the manufacturer's products. Probable contact between the domestic representative and the foreign corporation leading to actual notification is far more present here than in *Cosper*. If it was reasonably certain that a relatively casual sporting goods representative would apprise the 'foreign' manufacturer of service in *Cosper*, it is doubly reasonably certain Yamaha-America will apprise Yamaha-Japan of any service in California." (*Yamaha, supra*, 174 Cal.App.4th at p. 274.)

When the prior panel of this court decided *Yamaha* in 2009, it noted it was bound by the California Supreme Court's decision in *Cosper* and stare decisis, but it suggested the state's high court revisit its discussion of "a

10

general manager in this state." (*Yamaha, supra*, 174 Cal.App.4th at p. 275, italics omitted.) In the ensuing 15 years, the Supreme Court has not done so. We find ourselves, like the prior panel in *Yamaha*, bound by the California Supreme Court's decision in *Cosper* and stare decisis. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455–456.)

Relying on *Cosper* and *Yamaha*, Kayar contends the trial court erred when it concluded HJC America and Hong did not qualify as HJC Korea's "general manager" in California for service of process under Corporations Code section 2110. We find ourselves unable to agree with the trial court.

Here, HJC America is a wholly owned subsidiary of HJC Korea and is located in California. Like in *Yamaha*, HJC America "is the American face of the" South Korean company. (*Yamaha, supra*, 174 Cal.App.4th at p. 274.) HJC America is the exclusive company that performs marketing in the United States for HJC Korea. In addition to conducting the marketing for HJC Korea, HJC America receives customer service calls from users of HJC Korea's products in the United States. HJC America also maintains a website with information concerning HJC Korea's products, as well as manuals and guides. While HJC America does not directly sell HJC Korea's products, it does act as a liaison between HJC Korea and its two distributors in the United States. HJC America also sponsors top riders to market HJC Korea helmets and it services those helmets. Moreover, HJC America acts as the liaison between HJC Korea and the DOT when HJC Korea helmets are shipped to laboratories in California and other states for testing.

Hong, like the employee in *Cosper*, performs several functions that indicate he "would have ample regular contact with [HJC Korea] and would be of 'sufficient character and rank to make it reasonably certain' that

11

[HJC Korea] would be appraised of the service of process." (*Cosper, supra*, 53 Cal.2d at p. 83.) Hong talks to HJC Korea about business issues "all the time." He provides graphic design advice to HJC Korea based on North American market trends. He negotiates licensing agreements between HJC Korea and other companies in the United States including, Marvel, DC Comics, Activision, Universal, Sega, and Replica.

Here, as in *Yamaha*, "[p]robable contact between the domestic representative and the foreign corporation leading to actual notification is far more present . . . than in *Cosper*." (*Yamaha, supra*, 174 Cal.App.4th at p. 274.) And like in *Yamaha*, given the contact between Hong and HJC Korea, "it is doubly reasonably certain" Hong will apprise HJC Korea of any service in California. (*Ibid.*)

In concluding Kayar failed to meet his burden of establishing valid service on HJC Korea, the trial court found Kayar's interpretation of Corporation Code section 2110 "expansive" and would allow "any entity or individual that conducts any business with a foreign corporation [to] be a suitable agency for service of process." We do not read Kayar's argument as permitting such service of process on a foreign corporation. Nevertheless, the trial court's concern is similar to that expressed by the panel in *Yamaha, supra*, 174 Cal.App.4th at page 275. Like our colleagues in *Yamaha*, we are bound by the California Supreme Court's *Cosper* decision.

We conclude HJC America or more specifically its president, Hong, qualifies as a "general manager" for service of process under Corporations Code section 2110. Thus, Kayar properly effected substitute service, and we reverse the court's order on this ground.

12

## II.

### PERSONAL JURISDICTION

In granting HJC Korea's motion to quash, the trial court also concluded it lacked personal jurisdiction, general or specific, over HJC Korea. Kayar contends the court erred by concluding 'it lacked specific jurisdiction over HJC Korea.[2] We agree.

*A. Standard of Review*

"The standard of review in an appeal from an order granting a motion to quash for lack of personal jurisdiction is well settled. 'In reviewing a trial court's determination of jurisdiction, we will not disturb the court's factual determinations "if supported by substantial evidence." [Citation.] "When no conflict in the evidence exists, however, the question of jurisdiction is purely one of law and the reviewing court engages in an independent review of the record."'" (*Preciado v. Freightliner Custom Chassis Corp.* (2023) 87 Cal.App.5th 964, 975 (*Preciado*); accord, *Brue v. Al Shabaab* (2020) 54 Cal.App.5th 578, 589–590.) Here, we conduct an independent review as there are no disputed facts.

*B. General Principles*

"California courts may exercise personal jurisdiction on any basis consistent with the Constitutions of California and the United States." (*Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 268 (*Pavlovich*); see also Code Civ. Proc., § 410.10.) "The exercise of jurisdiction over a nonresident defendant comports with these Constitutions 'if the defendant has such

---

[2] Kayar makes an abbreviated argument the court erred by concluding it lacked general jurisdiction as well. We do not reach this issue as we conclude the court had specific jurisdiction.

13

minimum contacts with the state that the assertion of jurisdiction does not violate "'traditional notions of fair play and substantial justice.'"" (*Pavlovich*, at p. 268; accord, *Fuld v. PLO* (2025) ___U.S.___, ___ [145 S.Ct. 2090, 2102] (*Fuld*); *Snowney v. Harrah's Entertainment, Inc.* (2005) 35 Cal.4th 1054, 1061 (*Snowney*).) "In giving content to that formulation, the [United States Supreme] Court has long focused on the nature and extent of 'the defendant's relationship to the forum State.'" (*Ford Motor Co. v. Mont. Eighth Judicial Dist. Court* (2021) 592 U.S. 351, 358 (*Ford*).) "[T]he minimum contacts test asks 'whether the "quality and nature" of the defendant's activity is such that it is "reasonable" and "fair" to require him to conduct his defense in that State.' [Citations.] The test 'is not susceptible of mechanical application; rather, the facts of each case must be weighed to determine whether the requisite "affiliating circumstances" are present.'" (*Snowney,* at p. 1061.)

The decisions of the United States Supreme Court recognize "two kinds of personal jurisdiction: general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." (*Ford, supra*, 592 U.S. at p. 358.) "General jurisdiction lies in the forum where the defendant is domiciled or 'fairly regarded as at home.'" (*Fuld, supra*, ___U.S. at p. ___ [145 S.Ct. at p. 2102].) "'Specific jurisdiction . . . covers defendants less intimately connected with a State, but only as to a narrower class of claims.'" (*Id.* ___ U.S. at p. ___ [145 S.Ct. at pp. 2102–2103].)

"When a defendant moves to quash service of process on jurisdictional grounds, the plaintiff has the initial burden of demonstrating facts justifying the exercise of jurisdiction." (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 449.) "To meet this burden, a plaintiff must do more than make allegations. A plaintiff must support its allegations with 'competent evidence of jurisdictional facts.'" (*Rivelli v. Hemm* (2021)

14

67 Cal.App.5th 380, 393.) "'Once facts showing minimum contacts with the forum state are established, however, it becomes the defendant's burden to demonstrate that the exercise of jurisdiction would be unreasonable.'" (*Preciado, supra*, 87 Cal.App.5th at p. 976; accord, *Rivelli,* at p. 393.)

*C. Specific Jurisdiction*

"The contacts needed for [specific] jurisdiction often go by the name 'purposeful availment.' [Citation.] The defendant . . . must take 'some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State.' [Citation.] The contacts must be the defendant's own choice and not 'random, isolated, or fortuitous.' [Citation.] They must show that the defendant deliberately 'reached out beyond' its home—by, for example, 'exploi[ting] a market' in the forum State or entering a contractual relationship centered there. [Citation.] Yet even then—because the defendant is not 'at home'— the forum State may exercise jurisdiction in only certain cases. The plaintiff's claims . . . 'must arise out of or relate to the defendant's contacts' with the forum." (*Ford, supra*, 592 U.S. at p. 359; accord, *Fuld, supra*, ___U.S. at p. ___ [145 S.Ct. at p. 2103 ] ["the plaintiff's claims . . . must 'deriv[e] from, or [be] connected with'" the defendant's activities within the forum State].)

"Thus, a two-part showing by the plaintiff is required to establish specific jurisdiction: '[(1)] the defendant has "purposefully directed" his activities at residents of the forum, . . . and [(2)] the litigation results from alleged injuries that "arise out of or relate to" those activities.'" (*Preciado, supra*, 87 Cal.App.5th at p. 977.)

1. Purposeful Availment

"'"The purposeful availment inquiry . . . focuses on the defendant's intentionality. [Citation.] This prong is only satisfied when the

15

defendant purposefully and voluntarily directs [its] activities toward the forum so that [it] should expect, by virtue of the benefit [it] receives, to be subject to the court's jurisdiction based on" [its] contacts with the forum.' [Citations.] Thus, purposeful availment occurs where a nonresident defendant "'purposefully direct[s]" [its] activities at residents of the forum' [citation], "'purposefully derive[s] benefit" from' its activities in the forum [citation], 'create[s] a "substantial connection" with the forum' [citation], "'deliberately" has engaged in significant activities within' the forum [citation], or 'has created "continuing obligations" between [itself] and residents of the forum' [citation]. By limiting the scope of a forum's jurisdiction in this manner, the "'purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts . . . .'" (*Snowney, supra*, 35 Cal.4th at pp. 1062–1063; accord, *Preciado, supra*, 87 Cal.App.5th at p. 978.)

Kayar argues he demonstrated HJC Korea purposefully availed itself of the benefits of doing business in California. To support his argument, he cites facts showing HJC Korea has had a continuous business relationship with a California corporation, Helmet House, for nearly 40 years; in the agreement between Helmet House and HJC Korea, each assumed continuing obligations toward the other; HJC Korea has derived millions in sales from this California corporation over the span of the agreement; since 2014, HJC Korea has sold on average 120,000 helmets per year to Helmet House; and Helmet House, in turn, has sold approximately 20,000 to 33,000 HJC Korea helmets per year to California consumers. Kayar also contends the evidence shows HJC Korea exclusively relies on its wholly owned subsidiary HJC America, a California corporation, to market its products and their marketing efforts are directed toward California residents and others.

16

The trial court concluded Kayar's showing was insufficient to establish purposeful availment. The court indicated Kayar must show more than HJC Korea "had substantial sales volume in California . . . to establish purposeful availment." The court continued: Kayar "relies upon two other factors to establish purposeful availment: (1) having a wholly owned subsidiary subject to California jurisdiction and (2) contracting with a California based distributor of its products. Neither of these are independent avenues to purposeful availment, standing alone."

HJC Korea contends the trial court got it right because it does not purposefully avail itself of the benefits of doing business in California. HJC Korea asserts: it has "essentially no contacts with California"; all of its potentially relevant activities (design, manufacture, and sale of motorcycle helmets) take place in either South Korea or Vietnam; it does not earn any direct revenue from the sale of its products to consumers in California; and it "plays *no role* in the downstream distribution of its helmets, including in the ultimate sale of the helmets to the end users."

The trial court assessed this as a close case. While we agree both sides submitted compelling arguments on the issues, exercising our independent judgment, we conclude Kayar has shown HJC Korea purposefully availed itself of the privilege of conducting activities within California.

"'California courts have consistently concluded that a foreign corporation purposefully avails itself of the benefits of the California forum when it knowingly sells and ships its products to California businesses for use in California.'" (*Preciado, supra*, 87 Cal.App.5th at p. 978.) For example, in *LG Chem, Ltd. v. Superior Court* (2022) 80 Cal.App.5th 348, the Court of Appeal held "a company who 'sold and shipped millions of its [particular]

17

batteries over the course of two years to three California companies for their use,' constituting sales that were 'substantially remunerative,' had 'purposefully availed itself of the benefits of doing business in California.'" (*Preciado,* at p. 978, quoting *LG Chem, Ltd.,* at p. 363.) "Put another way, 'if the sale of a product of a manufacturer or distributor . . . is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product' in the forum state, the purposeful availment requirement is met." (*Preciado,* at p. 978.)

Here, HJC Korea has been selling its products to a distributor in California for nearly 40 years. HJC Korea entered into the agreement with Helmet House in 1986 because it sought to expand its sales in the motorcycle helmet market in the United States and HJC Korea has been continuously serving that market since. But the "'mere foreseeability'" that Helmet House will sell HJC Korea's products to California consumers is not enough by itself to establish jurisdiction. (*Asahi Metal Indus. Co. v. Superior Court of Cal.* (1987) 480 U.S. 102, 111 (plur. opn. of O'Connor, J.).) "The 'substantial connection,' [citation], between the defendant and the forum State necessary for a finding of minimum contacts must come about by *an action of the defendant purposefully directed toward the forum State.* [Citations.] The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, *advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the*

18

*product through a distributor who has agreed to serve as the sales agent in the forum State.* (*Ibid.*, italics added.)

In the record before us, we see such additional conduct by HJC Korea indicating an intent to serve the market in California. HJC Korea has a contractual relationship with a distributor in California that acts as its sales agent in the state. It receives payment for orders from this distributor from a California bank. HJC Korea, through its subsidiary HJC America in California, advertises and promotes its products in California (and other states) through its website. Customer service for HJC Korea products in the United States is provided by HJC America in California. HJC Korea produces manuals and guides for its products, which it transmits to HJC America to post on its website as part of its marketing campaign. Videos posted on the website include motorcycle riders in California wearing HJC Korea helmets. The purpose of the information on HJC America's website is to generate sales of HJC Korea's products in California and elsewhere.

HJC Korea ships helmets to California, as well as other states, for laboratory testing. It provides helmets to riders sponsored by HJC America in a racing program, some of which have been California riders. Until recently, HJC Korea sent representatives to the United States twice a year to meet with its American distributors, including Helmet House in California.[3] Considering all of the facts together, we conclude there is a substantial connection between HJC Korea and California for a finding of purposeful availment.

---

[3] Kayar also relies on evidence Hong negotiated licensing agreements on HJC Korea's behalf with "California companies like Activision, Universal, and Sega." Because our record does not contain evidence showing these are in fact "California companies," we do not consider this evidence.

It is these additional facts that distinguish this case from *Bombardier Recreational Products, Inc. v. Dow Chemical Canada ULC* (2013) 216 Cal.App.4th 591, a case relied on by HJC Korea and cited by the trial court in its ruling. There, a plaintiff sued Bombardier for personal injuries sustained when a personal watercraft caught fire. Bombardier, the manufacturer of the personal watercraft, filed a cross-complaint against Dow Chemical, a Canadian corporation, whose predecessor manufactured fuel tanks Bombardier installed in its personal watercraft. (*Id.* at p. 595.) In *Bombardier*, the appellate court rejected the argument the Canadian corporation's "knowledge that its products would eventually enter the stream of commerce in California was sufficient to establish jurisdiction" (*id.* at p. 596) because the foreign entity "did not purposefully direct their activities toward the residents of California" and "created no substantial connection with California or continuing obligations between them and California." (*Id.* at p. 603.) Here, the evidence shows otherwise.

Having found the purposeful availment prong of the specific jurisdiction analysis has been met, we move to the second prong.

2. Arising out of or Related to Contacts with the Forum

Under the second prong, the inquiry is whether the plaintiff's claims "'arise out of or relate to the defendant's contacts' with the forum." (*Ford, supra*, 592 U.S. at p. 359.) "The first half of that standard asks about causation; but the back half, after the 'or,' contemplates that some relationships will support jurisdiction without a causal showing. That does not mean anything goes. In the sphere of specific jurisdiction, the phrase 'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum. But again, [the United States Supreme Court] ha[s] never framed the specific jurisdiction inquiry as always requiring proof of

20

causation—*i.e.*, proof that the plaintiff's claim came about because of the defendant's in-state conduct." (*Id.* at p. 362.)

*Ford* concerned two product liability suits against the automobile manufacturer based on two car accidents involving different Ford models in different states. (*Ford, supra*, 592 U.S. at p. 356.) In each instance, the plaintiff brought suit in the state where the accident occurred. (*Id.* at p. 354.) Ford did not dispute it purposefully availed itself of the privilege of doing business in both states. (*Id.* at p. 361.) But it moved to dismiss the suits for lack of personal jurisdiction, asserting there was no causal link because the company had not designed, manufactured, or sold the particular vehicles involved in the accidents in the states in which the suits were brought. (*Id.* at pp. 356–357.) "Only later resales and relocations by consumers had brought the vehicles to" the states where the accidents occurred. (*Id.* at p. 357.) Ford argued the claims against it did not arise out of or relate to its contacts with the forum states. (*Id.* at p. 361.) The United States Supreme Court rejected "Ford's causation-only approach." (*Ibid.*)

In *Ford*, the United States Supreme Court explained "specific jurisdiction attaches in cases . . . when a company like Ford serves a market for a product in the forum State and the product malfunctions there." (*Ford, supra*, 592 U.S. at p. 363.) If a car company's business deliberately extends into a state, then the state's courts can hold the company accountable for a product defect even though the car has been designed, made, and sold in other states. (*Id.* at p. 363.) The Supreme Court found Ford's forum-state connections related to the plaintiffs' claims as Ford "advertised, sold, and serviced those two car models in both States for many years." (*Id.* at p. 365.) "In other words, Ford had systematically served a market in [the forum states] for the very vehicles that the plaintiffs allege malfunctioned and

21

injured them in those States. So there is a strong 'relationship among the defendant, the forum, and the litigation'—the 'essential foundation' of specific jurisdiction." (*Ibid.*) Summarizing its holding, the Supreme Court stated: "When a company like Ford serves a market for a product in a State and that product causes injury in the State to one of its residents, the State's courts may entertain the resulting suit." (*Id.* at p. 355.)

Here, the trial court found Kayar had not shown the allegations of his suit arose from HJC Korea's activities in California. Explaining its reasoning, the court stated each of Kayar's causes of action arise from allegations concerning HJC Korea's "design and manufacture of its products. [Kayar]'s factual showing in the Opposition is focused entirely upon establishing [HJC Korea]'s contacts with California through its marketing and sale of its products. The mere fact that [HJC Korea] placed goods into the stream of commerce that eventually reached a consumer in California does not lead to the conclusion that contracting with a distributor in California (who distributed [HJC Korea]'s products throughout the United States) and having a subsidiary based in California makes its contacts with California germane to activities (the design and manufacture of helmets) of [HJC Korea] that took place outside of California and have no specific relation to California."

Again, we view the evidence differently than the trial court. Kayar's argument is not based merely on the fact HJC Korea placed motorcycle helmets into the stream of commerce that eventually caused an injury to a resident of California. While the contacts between HJC Korea and California are not as extensive as the contacts between Ford and the forum states in *Ford, supra*, 592 U.S. 351, the evidence shows HJC Korea has made sustained and systematic efforts to serve a market in California for

22

motorcycle helmets. To be sure, HJC Korea does not directly sell its products to California consumers, but it nonetheless pursues them through advertising, marketing, and the information provided on HJC America's website. Through its subsidiary, it provides customer services to consumers of its products in California, seeking to foster loyalty and brand satisfaction. Given HJC Korea's directed activities in California's motorcycle helmet market, we conclude the "'relationship among the defendant, the forum, and the litigation'" (*Ford, supra*, 592 U.S. at p. 365) is sufficiently strong enough that HJC Korea "'must reasonably anticipate being haled into [California's] court[s]' to defend actions 'based on' [its] products causing injury there" (*id.* at p. 364).

We find the second prong of the specific jurisdiction analysis is satisfied as Kayar's dispute arises out of and relates to HJC Korea's contacts with California.

3. Reasonableness

Lastly, we must determine whether the assertion of jurisdiction over HJC Korea would be fair and reasonable. (*Jayone Foods, Inc. v. Aekyung Industrial Co. Ltd.* (2019) 31 Cal.App.5th 543, 563 (*Jayone Foods, Inc.*).) "In evaluating whether the exercise of specific jurisdiction would comport with fair play and substantial justice, the "'court 'must consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief. It must also weigh in its determination "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies.""" [Citation.] "Where . . . a defendant who purposefully has directed [its] activities at forum residents seeks to defeat jurisdiction, [it] must present a compelling case that the presence of

23

some other considerations would render jurisdiction unreasonable." [Citation.]' [Citation.] In the case of a foreign company, '[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders.' [Citation.] However, '[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant.'" (*Ibid.*)

Below and on appeal, HJC Korea makes only a conclusory argument that the exercise of jurisdiction over it would be unreasonable, asserting it "would not comport with notions of 'fair play and substantial justice' [citation], as HJC Korea has no direct contacts with and did not purposefully direct any of its activities California." Because the trial court concluded Kayar had not meet his burden under the first two prongs, it did not reach the issue of whether HJC Korea had shown exercising jurisdiction over it would be unreasonable.

Given HJC Korea's contacts with California, as discussed *ante*, the assertion of specific jurisdiction would not be unreasonable here. "California . . . has 'a substantial interest in providing a forum in which a California resident may seek redress for injuries sustained' in the state." (*Jayone Foods, Inc., supra*, 31 Cal.App.5th at p. 564.) Kayar, a resident of California, suffered a traumatic brain injury when a helmet designed and manufactured by HJC Korea cracked. The two other defendants in Kayar's products liability action—HJC America and Quach—are subject to California's jurisdiction. HJC Korea has failed to make a compelling argument the exercise of jurisdiction over it would be unreasonable or unfair.

24

Accordingly, we conclude HJC Korea is subject to personal jurisdiction in California and reverse the trial court's order on this ground as well.

DISPOSITION

The order dismissing respondent HJC Corporation from the above entitled action based on invalid service and lack of personal jurisdiction is reversed and the matter remanded to the trial court for further proceedings. Appellant Kayar is to recover his costs on appeal.


MOTOIKE, ACTING P. J.

WE CONCUR:


DELANEY, J.


GOODING, J.